Rob Bonta
Attorney General of California
Jeffrey T. Fisher
Supervising Deputy Attorney General
Cassandra J. Shryock
Deputy Attorney General
State Bar No. 300360
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-3622
  Fax: (415) 703-5843
  E-mail: Cassandra.Shryock@doj.ca.gov
*Attorneys for Defendants*
*R. Diaz, R. Broomfield, and M. Houston*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **REGINALD THORPE,** | 3:21-cv-06960-WHO |
| Plaintiff, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| **RALPH DIAZ, et al.,** | Date: February 23, 2022 |
| Defendants. | Time: 2:00 p.m. |
| | Dept: 2, 17th Floor |
| | Judge: Hon. William H. Orrick |
| | Trial Date: None Set |
| | Action Filed: 9/8/2021 |

**TO PLAINTIFF BY AND THROUGH HIS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on February 23, 2022, at 2:00 p.m. in the United States

Courthouse located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendants

Diaz, Broomfield, and Houston will move this Court to dismiss the Complaint under Federal Rule

of Civil Procedure 12(b). Defendants bring this motion on the grounds that: (1) Defendants are

entitled to qualified immunity; and (2) Defendants are entitled to immunity under the Public

Readiness and Emergency Preparedness (PREP) Act.

1    This motion is based on this notice of motion and motion, the accompanying memorandum

2    of points and authorities, the concurrently filed request for judicial notice, and the Court's file in

3    this action.

4

5    Dated: December 31, 2021                         Respectfully submitted,

6                                                      ROB BONTA
                                                       Attorney General of California
7                                                      JEFFREY T. FISHER
                                                       Supervising Deputy Attorney General
8

9

10                                                     */s/ Cassandra J. Shryock*
                                                       CASSANDRA J. SHRYOCK
11                                                     Deputy Attorney General
                                                       *Attorneys for Defendants*
12                                                     *R. Diaz. R. Broomfield, and M. Houston*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Memorandum of Points And Authorities ...................................................................................... 1

Introduction .................................................................................................................................... 1

Statement of the Case .................................................................................................................... 2

    I.     CDCR's Health Care System Is in Federal Receivership. ................................... 2

          A.     Inmates Within CDCR Contracted COVID-19, and the Federal Receiver and CDCR Attempted to Contain the Spread of the Disease. ............................................................................................................. 2

          B.     The HHS Secretary Issued Declarations Invoking the Public Readiness and Emergency Preparedness (PREP) Act. ............................ 2

          C.     COVID-19 Spread to CDCR Institutions, Including CIM, Prompting a Transfer of Inmates Thought to Be Uninfected. ................... 3

          D.     Plaintiff Filed a Putative Class Action Asserting One Claim of Deliberate Indifference Based on the CIM-to-San Quentin Transfer. ........ 4

Statement of the Issues .................................................................................................................. 4

Standard of Review ........................................................................................................................ 5

Argument ....................................................................................................................................... 5

    I.     Defendants Are Entitled to Qualified Immunity. .................................................. 5

          A.     The Complaint Does Not Plausibly Allege that Defendants Violated Mr. Thorpe's Constitutional Rights. ..................................................... 6

          B.     It Was Not Clearly Established that Conducting the Inmate Transfer as Directed By a Federal Receiver Would Violate the Eighth Amendment. ................................................................................................ 7

    II.    Defendants Are Also Entitled to the Public Readiness and Emergency Preparedness (PREP) Act's Broad Immunity. .................................................... 14

Conclusion ................................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page**

**CASES**

Adam Lane ADC 155843 v. William Straughn, et al.
No. 4:20-cv-01067-BRW-JTK, 2021 WL 5240179 (E.D. Ark. Oct. 13, 2021).................... 13

Ashcroft v. Iqbal
556 U.S. 662 (2009).......................................................................................................... 5, 6

Beliveau v. Caras
873 F. Supp. 1393 (C.D. Cal. 1995) ...................................................................................... 5

Bell Atl. Corp. v. Twombly
550 U.S. 544 (2007)................................................................................................................ 5

City & Cty. of San Francisco v. Sheehan
575 U.S. 600 (2015)................................................................................................................ 8

Daniels–Hall v. Nat'l Educ. Ass'n
629 F.3d 992 (9th Cir. 2010) ................................................................................................. 5

District of Columbia v. Wesby
138 S. Ct. 577 (2018) ......................................................................................................... 5, 8

Emmons v. City of Escondido
921 F.3d 1172 (9th Cir. 2019) (per curiam) ......................................................................... 7

Garcia v. Los Angeles County
No. 2:20-cv-08528-JVS-KES, 2021 WL 4497213 (C.D. Cal. July 7, 2021) ....................... 13

Garcia v. Welltower OpCo Grp. LLC
522 F. Supp. 3d 734 (C.D. Cal. 2021) .....................................................................3, 14, 16

Ham v. Allison
No. 21-cv-00909-YGR, 2021 WL 3129583 (N.D. Cal. July 23, 2021)................................. 7

Hamby v. Hammond
821 F.3d 1085 (9th Cir. 2016) ............................................................................................... 8

Harper v. City of Los Angeles
533 F.3d 1010 (9th Cir. 2008) ............................................................................................... 6

Hines v. Youseff
914 F.3d 1218 (9th Cir. 2019) ........................................................................................ 2, 11

ii

1

2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

4

*Jones v. Lay*
4:20-cv-1325-BRW-BD, 2021 WL 687342 (E.D. Ark. Jan, 25, 2021) ................................. 13

5

*Kesling v. Tewalt*
476 F. Supp. 3d 1077 (D. Idaho Aug. 4, 2020) ...................................................... 12

6

7

*Kisela v. Hughes*
138 S. Ct 1148 (2018) (per curiam) ................................................................. 8

8

9

*Leer v. Murphy*
844 F.2d 628 (9th Cir. 1988) ......................................................................... 6

10

*Messerchmidt v. Millender*
565 U.S. 535 (2012) ................................................................................... 5

11

12

*Morales v. Fry*
873 F.3d 817 (9th Cir. 2017) ...................................................................... 5, 8

13

14

*Mullis v. U.S. Bankr. Ct.*
828 F.2d 1385 (9th Cir. 1987) ........................................................................ 5

15

*OSU Student Alliance v. Ray*
699 F.3d 1053 (9th Cir. 2012) ........................................................................ 6

16

17

*Pearson v. Callahan*
555 U.S. 223 (2009) ................................................................................... 5

18

19

*Plata v. Davis*
N.D. Cal. No. 01-cv-01351 ................................................................... 2, 3, 11, 13

20

*Plata v. Newsom*
445 F. Supp. 3d 557 (N.D. Cal. 2020) ..................................................... 2, 11, 14

21

22

*Rico v. Ducart*
980 F.3d 1292 (9th Cir. 2020) ...................................................................... 10

23

24

*Rouse v. Washington*
No. 20-cv-11409, 2021 WL 2434196 (E.D. Mich. June 15, 2021) ........................... 7

25

*Rubio v. Allison*
No. 21-cv-00921-YGR, 2021 WL 3173295 (N.D. Cal. Jul 26, 2021) ......................... 7

26

27

*S.B. v. County of San Diego*
864 F.3d 1010 (9th Cir. 2017) ........................................................................ 8

28

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Sorrels*
    290 F.3d at 971 ................................................................................................ 13

*Swain v. Junior*
    961 F.3d 1276 (11th Cir. 2020) ..................................................................... 12

*Taylor v. List*
    880 F.2d 1040 (9th Cir. 1989) ......................................................................... 6

*White*
    137 S. Ct. at 552 .............................................................................................. 8

*Wilson v. Williams*
    961 F.3d 829 ................................................................................................... 12

*Young v. Bonner*
    No. 2:20-cv-02614-TLP, 2021 WL 4699089 (W.D. Tenn. Oct. 7, 2021) ........... 13

STATUTES

United States Code Title 42
    § 247d-6(e) .................................................................................................... 17
    § 247d-6d(i)(2)(B) ......................................................................................... 15
    § 247d-6d(i)(7) .............................................................................................. 14
    § 247d-6d(a)(1) & (b) ............................................................................... 3, 14
    § 1983 .................................................................................................... 4, 6, 7

PREP Act ..................................................................................................... 14, 15, 16

CONSTITUTIONAL PROVISIONS

United States Constitution
    Eighth Amendment ................................................................................. *passim*

COURT RULES

Federal Rules of Civil Procedure
    Rule 12(b)(6) .................................................................................................. 5

OTHER AUTHORITIES

Emergency Use Authorizations. Food & Drug Administration, *FDA Combating*
    *COVID-19 with Medical Devices*,
    https://www.fda.gov/media/136702/download ................................................ 15

1

### TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3

Federal Register Volume 85
    15198-01.................................................................................................................. 3
4   15200.............................................................................................................. 15, 16
5   15202................................................................................................................ 14
    79191.................................................................................................................. 3
6   79197................................................................................................................ 16
    79198................................................................................................................ 17

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

For almost two years now, the State of California has been battling the COVID-19 global pandemic, a public health crisis of a magnitude not seen in recent history. And just as no city or county in California was immune from the pandemic, neither was the state prison system. In the early months of the pandemic—when the allegations in the complaint occurred—much was still unknown about the epidemiological characteristics of COVID-19, like how it is transmitted and whether it is commonly spread by people without symptoms. And in this uncertain landscape, Defendants—under the oversight of a federal Receiver—were charged with managing a prison system of finite resources and keeping its population safe from this new, enigmatic threat.

In response to a growing COVID-19 outbreak at the California Institution for Men (CIM), the Receiver directed the California Department of Corrections and Rehabilitation (CDCR) to transfer medically vulnerable inmates who had tested negative for the virus from CIM to San Quentin State Prison, where there were no reported cases of COVID-19. Despite the precautions that were taken, roughly a dozen of the transferred inmates had COVID-19 upon arrival at San Quentin, and it quickly spread throughout the prison. Plaintiff Reginald Thorpe is an inmate who was housed at San Quentin and contracted COVID-19 in the weeks after the transfer.

Thorpe now brings suit against the former Secretary of CDCR and the wardens of CIM and San Quentin, alleging that the CIM-to-San Quentin transfer, and how the transfer was conducted, caused him to contract COVID-19. With the benefit of 20/20 hindsight, the transfer may have been unwise, or mistakes may have been made in its execution. But given the ever-evolving circumstances, the exigency of the outbreak at CIM, and the continuous oversight by a federally appointed Receiver and a federal court, reasonable officials in Defendants' positions would have believed that their actions complied with the Constitution. They are thus protected by qualified immunity. Defendants are also immune from liability under the Public Readiness and Emergency Preparedness (PREP) Act.

Accordingly, the Court should dismiss the Complaint without leave to amend.

1

# STATEMENT OF THE CASE

## I.    CDCR's HEALTH CARE SYSTEM IS IN FEDERAL RECEIVERSHIP.

In 2006, the court in *Plata v. Davis*, N.D. Cal. No. 01-cv-01351, appointed a federal Receiver and conferred on the Receiver "all the powers vested by law in the Secretary of the [CDCR] as they relate to the administration, control, management, operation, and financing of the California prison medical health care system." *Hines v. Youseff*, 914 F.3d 1218, 1223 (9th Cir. 2019). At the same time, the court "suspended" CDCR's exercise of those powers "for the duration of the Receivership." *Id.* Therefore, since 2006, state officials have made decisions about prison medical care while under the control of the federal Receiver, who was appointed by the federal court to ensure compliance with the Eighth Amendment. *Id.* California's prison medical care system was in receivership at all times relevant to Plaintiff's complaint, and still is.

### A.    Inmates Within CDCR Contracted COVID-19, and the Federal Receiver and CDCR Attempted to Contain the Spread of the Disease.

The first reported cases COVID-19 in the United States were in early 2020, and the Governor of California declared a State of Emergency on March 4, 2020. (Compl. ¶ 13.) Even before that, in February 2020, CDCR began planning its COVID-19 response, and proactively began taking preventive measures no later than March 11, 2020. *See Plata v. Newsom*, 445 F. Supp. 3d 557, 562-63 (N.D. Cal. 2020). CDCR cancelled visitation, distributed informational materials to inmates, and ordered additional hand sanitizing stations. *Id.* CDCR also activated a "command center" where experts at CDCR and the California Correctional Health Care Services (CCHCS) could prepare and exchange information, to quickly make decisions and provide uniform guidance. *Id.*

### B.    The HHS Secretary Issued Declarations Invoking the Public Readiness and Emergency Preparedness (PREP) Act.

Under the PREP Act, the Secretary of the U.S. Department of Health and Human Services may issue a Declaration in response to a public health emergency, which immunizes certain individuals and entities from suit under federal and state law for all claims of loss "caused by, arising out of, relating to, or resulting from" the administration of a "covered countermeasure"

2

1    during the declared health emergency. 42 U.S.C. § 247d-6d(a)(1) & (b); *see also Garcia v.*

2    *Welltower OpCo Grp. LLC*, 522 F. Supp. 3d 734, 739 (C.D. Cal. 2021).

3        In March 2020, the HHS Secretary issued a declaration invoking this broad immunity for

4    covered persons tasked with the administration of COVID-19 screening and testing, PPE,

5    mechanical ventilation, and other countermeasures necessary to treat and mitigate the spread of

6    COVID-19. *See Decl. Under the PREP Act for Medical Countermeasures Against COVID-19*, 85

7    Fed. Reg. 15198-01. The HHS Secretary has since amended the Declaration six times, and the

8    HHS's Office of General Counsel has issued advisory opinions, elaborating on the PREP Act's

9    protection of program planners who must make managerial and operational decisions about the

10   use of COVID-19 countermeasures. *See* 85 Fed. Reg. 79191.

11   **C.    COVID-19 Spread to CDCR Institutions, Including CIM, Prompting a
             Transfer of Inmates Thought to Be Uninfected.**

12

13       Despite the preventative measures taken by CDCR, the first inmate tested positive for

14   COVID-19 on March 22, 2020. The outbreak soon spread to CIM. (*See* Compl. ¶ 12; *see also*

15   Compl. at 29.) COVID-19 cases there spiked in the month of May: in the first two weeks alone,

16   the number of cases went from roughly 100 to over 400.  (Compl. at 29, 43-44.)  And towards the

17   end of the month, there were over 650 cases.  (*See* Compl. ¶ 12; *see also* Compl. at 29, 43-44.)

18   The *Plata* plaintiffs urged CDCR and the Receiver to transfer medically high-risk inmates out of

19   CIM because of the outbreak. (Defs.' Req. Judicial Notice (RJN), Exh. B at 4.) The Receiver

20   testified that he spent weeks considering whether it was possible to "safely move a large number

21   of those vulnerable [inmates] to another facility—with the goal of saving lives. The decision

22   involved a balancing of the growing risks to the CIM patients against the risks of any large scale

23   transfer." (RJN, Exh. E at 59.) On May 27, CDCR told the *Plata* court that "[b]ecause COVID-19

24   has spread to every housing unit within CIM, the Receiver . . . directed that high-risk inmates at

25   CIM who test negative for COVID-19 be transferred to facilities in institutions that remain

26   COVID-free." (RJN, Exh. C at 14; *see also* Compl. at 44.)

27       Accordingly, 122 medically high-risk inmates were transferred from CIM to San Quentin

28   on May 30, 2020. (Compl. ¶ 12.) All of the transferred inmates had a negative COVID-19 test,

3

but many of the inmates had not been tested for COVID-19 in several weeks because the

Receiver's guidance did not mandate how far in advance of a transfer an inmate needed to be

tested. (*See* Compl. ¶¶ 16-17; *see also* RJN Exh. D at 9, n.5.) When the CIM inmates arrived at

San Quentin, they were tested for COVID-19 again; this time, several inmates tested positive.

(*Id.*; Compl. ¶ 18.) The CIM inmates were then quarantined in Badger unit, which has "open-air

cells." (Compl. ¶ 18.)

On or about June 24, 2020, Plaintiff Reginald Thorpe—an inmate at San Quentin—was

diagnosed with COVID-19. (Compl. ¶ 7.)

> **D.    Plaintiff Filed a Putative Class Action Asserting One Claim of Deliberate Indifference Based on the CIM-to-San Quentin Transfer.**

Mr. Thorpe filed this action on September 8, 2021, asserting one claim under 42 U.S.C.

§ 1983 for deliberate indifference to serious medical needs. (Compl. at 1, 9-10.) He brings this

claim against three named CDCR officials—Ralph Diaz, former Secretary of CDCR; Ronald

Broomfield, former acting warden of San Quentin; and Mona Houston, former warden of CIM—

and 100 unnamed Doe defendants. (*Id.* at 2-3.) Mr. Thorpe purports to bring this action on behalf

of himself and a class of similarly situated San Quentin inmates. (*Id.* at 7-9.)[1]

At its heart, Mr. Thorpe bases his claim on one event: the May 2020 transfer of 122 inmates

from CIM to San Quentin. (*See id.* ¶¶ 1, 8–11, 12–13.) He maintains that the transfer violated the

Eighth Amendment because there was not "timely and adequate testing of the transferees

beforehand," the buses used to execute the transfer were "overcrowded," and the inmates were

not fully isolated from other San Quentin inmates once they arrived. (*Id.* ¶¶ 14-18.)

## STATEMENT OF THE ISSUES

1.    Are Defendants entitled to qualified immunity where Mr. Thorpe has not adequately

alleged any Defendant violated his constitutional rights, and where Defendants' alleged

misconduct was overseen by a federal Receiver and federal court?

---

[1] Though not at issue in this motion, if the action is permitted to proceed, Defendants will oppose certification of the proposed class at least because it is over-inclusive and unascertainable. (*Cf.* ECF No. 1, ¶ 23 (defining the class to include "current and former inmates at San Quentin State Prison who (1) have been diagnosed with COVID-19 and (2) for whom the transfer of inmates from [CIM] to San Quentin [] was a substantial factor in their diagnosis.").)

4

2.      Are Defendants immune from liability under the Public Readiness and Emergency Preparedness (PREP) Act where Mr. Thorpe's alleged injury is related to the administration of COVID-19 countermeasures by Defendants, who are covered persons?

### STANDARD OF REVIEW

Granting a motion to dismiss under Rule 12(b)(6) is appropriate when the non-moving party fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A court should make all inferences reasonably drawn from the alleged facts in favor of the non-moving party, but it need not accept as true allegations that contradict facts subject to judicial notice, or facts that contradict exhibits attached to the complaint. *Mullis v. U.S. Bankr. Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987); *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). And a court need not accept as true conclusory allegations or legal characterizations, nor must it accept unreasonable inferences or unwarranted factual deductions. *Beliveau v. Caras*, 873 F. Supp. 1393, 1395-96 (C.D. Cal. 1995). The alleged facts must show a right to relief that is more than mere speculation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

### ARGUMENT

I.      **DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments." *Messerchmidt v. Millender*, 565 U.S. 535, 546-47 (2012). The doctrine shields government officials from damages liability unless: (1) they violate a federal statutory or constitutional right; and (2) that right was "clearly established" at the time of the challenged conduct. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). Courts may decide which prong of the qualified-immunity analysis to address first, *Pearson v. Callahan*, 555 U.S. 223, 236–39 (2009), but are encouraged to begin with the second prong because it can be determined as a matter of law early on, and thereby "expedite the resolution of the case," *see Morales v. Fry*,

5

873 F.3d 817, 822–23 (9th Cir. 2017) (noting the trend toward resolving qualified immunity as a legal issue early in the litigation whenever possible).

Here, Defendants are entitled to immunity under both prongs of the qualified-immunity analysis. Mr. Thorpe has not pleaded a plausible constitutional claim against Defendants. And Mr. Thorpe did not have a clearly established right—in May 2020—to testing within a particular time-frame, or a prison transfer being carried out in a particular manner.

### A. The Complaint Does Not Plausibly Allege that Defendants Violated Mr. Thorpe's Constitutional Rights.

Mr. Thorpe has not pleaded sufficient facts to establish Defendants, who are supervisory officials, violated his constitutional rights.

To state a Section 1983 claim, a complaint must allege that a defendant caused a deprivation of the plaintiff's federal rights. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). There is no vicarious liability in Section 1983 lawsuits. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Thus, a government official is not liable under Section 1983 unless the particular official's own actions caused the alleged constitutional deprivation. *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1069 (9th Cir. 2012). A plaintiff must establish both causation-in-fact and proximate causation. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). Allegations regarding causation "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (citations omitted). "Sweeping conclusory allegations will not suffice." *Id.* (citation omitted).

Here, that is all the Complaint contains: conclusory allegations. Defendant were allegedly "personally involved in ordering, approving, and/or acquiescing to the decisions relating to the CIM transfer as alleged herein." (Compl. ¶¶ 8-10.) But the Complaint does not include any specific allegations about any of the Defendants and their acts or omissions. The Complaint merely states Defendants, collectively, "knew about the threat COVID-19 posed to the population in general and the prison population at San Quentin specifically," "ordered, approved, and/or acquiesced to the transfer without timely and adequate testing of the transferees," and "ordered,

6

1  approved, and/or acquiesced to the placement of the transferees in the Badger housing unit . . .

2  where tiers of open-air cells open into a shared atrium." (Compl. ¶¶ 13-14, 18.) These bare

3  allegations do not show any Defendant's personal involvement in a constitutional violation. *See*

4  *Rouse v. Washington*, No. 20-cv-11409, 2021 WL 2434196, at *10 (E.D. Mich. June 15, 2021)

5  (allegation that "defendants failed and refused to implement and enforce isolation of plaintiffs [...]

6  during testing after exposure" insufficient to show personal involvement). Because Mr. Thorpe

7  groups all Defendants together, without pleading *facts* connecting their supervisory acts or

8  omissions to a violation, he has not alleged anything beyond Defendants "unlawfully harmed

9  me." This does not state a plausible claim for relief.

10     Other courts in this district have concluded that similar conclusory allegations against

11  supervisory personnel related to the CIM-to-San Quentin transfer did not state a Section 1983

12  claim. *Rubio v. Allison*, No. 21-cv-00921-YGR, 2021 WL 3173295, at *3 (N.D. Cal. Jul 26,

13  2021) (finding allegation that Defendants "were aware of" the CIM transfer and "failed to take

14  prudent action," did not provide sufficient information as to how each named Defendant was

15  directly involved in the constitutional deprivation); *Ham v. Allison*, No. 21-cv-00909-YGR, 2021

16  WL 3129583, at *2 (N.D. Cal. July 23, 2021) (same). Similarly here, there are no factual

17  allegations connecting any Defendant to Mr. Thorpe contracting COVID-19.

18     Because Mr. Thorpe has not pleaded any *facts* connecting any Defendant to his contracting

19  COVID-19, he has not pleaded a constitutional violation and Defendants are entitled to qualified

20  immunity under the first prong of the analysis.

21     **B.    It Was Not Clearly Established that Conducting the Inmate Transfer as
            Directed By a Federal Receiver Would Violate the Eighth Amendment.**
22

23     Defendants are also entitled to qualified immunity because it was not clearly established

24  carrying out the CIM-to-San Quentin transfer, as ordered by a federal Receiver and supervised by

25  a federal court, would violate any inmate's Eighth Amendment rights.

26     The plaintiff "bears the burden of showing that the right at issue was clearly established."

27  *Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019) (per curiam). And a right is

28  "clearly established" only if the law is so clear that, under the particular circumstances the official

7

1  faced, "every 'reasonable official would understand that what he is doing' is unlawful." *Wesby*,

2  138 S. Ct. at 589 (quoting *al-Kidd*, 563 U.S. at 741); *see Morales*, 873 F.3d at 823 (emphasizing

3  "every" reasonable official would understand that his or her conduct was unlawful). "It is not

4  enough that the rule is suggested by then-existing precedent" because "[o]therwise, the rule is not

5  one that 'every reasonable official' would know." *Wesby*, 139 S. Ct. at 590 (internal citation

6  omitted). And this analysis must look to the circumstances confronting the official at the time he

7  acted, not with the 20/20 vision of hindsight. *See City & Cty. of San Francisco v. Sheehan*, 575

8  U.S. 600, 615 (2015) ("Courts must not judge officers with 'the 20/20 vision of hindsight.'").

9       The Supreme Court has stressed that courts must not define clearly established rights with a

10  high level of generality because "doing so avoids the crucial question whether the official acted

11  reasonably in the particular circumstances that he or she faced." *Wesby*, 138 S. Ct. at 590; *see*

12  *Kisela v. Hughes*, 138 S. Ct 1148, 1152 (2018) (per curiam) ("This Court has 'repeatedly told the

13  courts … not to define clearly established law at a high level of generality'"); *see also S.B. v.*

14  *County of San Diego*, 864 F.3d 1010, 1016 (9th Cir. 2017) (acknowledging the Supreme Court's

15  recent frustration with federal courts denying qualified immunity based on general principles

16  rather than the specific circumstances surrounding the defendant).

17       The qualified immunity standard places great emphasis on the clarity of the law's

18  application to the unique circumstances of the individual defendant's case. *White*, 137 S. Ct. at

19  552. This "demanding" and "exacting standard" protects all but the plainly incompetent or those

20  who knowingly violate the law. *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335,

21  341 (1986)). To conduct this analysis, a court first defines the circumstances with which the

22  defendants were confronted, then analyzes existing case law to determine whether controlling

23  authority—or a robust consensus of persuasive authority—found a constitutional violation "under

24  similar circumstances." *Wesby*, 138 S. Ct. at 590–91. "[S]tate officials are entitled to qualified

25  immunity so long as none of our precedents 'squarely governs the facts here.'" *Hamby v.*

26  *Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016).

27       The results of the CIM-to-San Quentin transfer are regrettable. But, given the facts and

28  circumstances at the time, reasonable officials would have believed their actions were lawful.

8

Defs.' Not. Mot. & Mot. Dismiss Compl. (3:21-cv-06960-WHO)

1    First, the COVID-19 pandemic itself is unprecedented, being more transmissible and more deadly

2    than anything seen in generations. And relatively little was known about the virus in May 2020.

3    At the time of the challenged transfer, COVID-19 was still a brand new threat, and public health

4    authorities were releasing new guidance about it on a near-daily basis. In May 2020, it was not

5    even fully understood how it was transmitted—the CDC's and World Health Organization's

6    guidance said it was transmitted primarily through droplets, and it was not for several more

7    months that both of those organizations released guidance confirming that it was also aerosolized.

8    (RJN Exh. F, G, and I.) And, though it was known that people could be infected with COVID yet

9    exhibit no symptoms, it was not known whether that was a common occurrence, or whether those

10   individuals could transmit the disease to others. (*Id.*) In other words, the very nature of the disease

11   was still largely a mystery when the alleged conduct occurred.

12       Second, the transfer was intended to protect the CIM transferees. The inmates were

13   transferred because COVID was spreading rapidly at CIM, they were at particularly high risk for

14   the disease, and prior test results indicated had not yet been infected. (*See* Compl. at 43-44.)

15   Officials were facing a difficult choice—leave these high-risk inmates at CIM, where they would

16   almost certainly contract COVID-19 and possibly die; or move them, with a risk of bringing the

17   infection into a new institution. (*See id.*) With the benefit hindsight, it is easy to criticize their

18   choice. But the Court should not disregard the noble goal of the transfer, or the difficult decision

19   facing these officials, in assessing whether one might reasonably believe the conduct was

20   constitutional.

21       Third, uniquely, a federal court and federal Receiver oversee and control healthcare within

22   California prisons to ensure the care provided satisfies the Eighth Amendment. (*See* RJN, Exh.

23   F.) Attachments to the complaint establish—and there is no reasonable dispute—that the CIM-to-

24   San Quentin transfer, and many aspects of how the transfer was carried out, were directed and

25   supervised by the federal Receiver and the federal court. And Mr. Thorpe does not allege that the

26   Receiver issued any guidance that CDCR officials declined to follow.

27       The Receiver directed that high-risk inmates at CIM who had tested negative for COVID-

28   19 be transferred to institutions that remained COVID-free. (*See* Compl. at 48; *see also* RJN, Exh.

9

H at 7-8.) He identified 691 high-risk inmates at CIM who had tested negative and who should be transferred. (*Id.*) And then-existing CCHCS protocols did not specify how recently an inmate should test negative for COVID-19 before a transfer. (Compl. at 53; RJN, Ex. H.) CCHCS also approved increasing the number of inmates who could be put in each bus for the transfer from 19 to 25 (65% of the buses' normal capacity of 38), as long as all inmates were from the same dorm. (Compl. at 60-61.) Thus, the decision to rely on existing tests, rather than re-testing inmates before transfer, as well as the decision to fill the transport buses to 65% capacity, were consistent with the Receiver's instructions and guidance. (Compl. at 53, 60-61; RJN Exh. H at 7-8.) Under such circumstances, reasonable officials would believe the transfer of inmates from CIM to San Quentin at the time they were transferred, and in the manner they were transferred, was constitutional.

The Ninth Circuit has granted qualified immunity to prison officials where, like here, their actions were overseen by a federal court. In *Rico v. Ducart*, 980 F.3d 1292, 1301-02 (9th Cir. 2020), officials followed the guidance of the *Coleman v. Newsom* special master in implementing "Guard One" suicide-prevention protocols. The *Rico* plaintiff alleged that officers executed the protocols in a way that interfered with his sleep: they caused extra noise by running up and down metal stairs, used the Guard One equipment more loudly than necessary, and rushed through the checks. *Id*. But because they were implementing a protocol approved by the federally-appointed *Coleman* special master, and mandated by the *Coleman* court, the Ninth Circuit concluded that an officer could have reasonably believed that executing the checks, even while making more noise that necessary, would not violate the Eighth Amendment. *Id.* at 1301-03 (noting how the federal court's involvement the special master's oversight would "play a major role in determining what reasonable officials in the defendants' shoes would have understood" about the constitutionality of their actions). Even if the officers did, in fact, create extra noise in conducting Guard One checks, they were entitled to qualified immunity because their actions fell "within the vast zone of conduct that is perhaps regrettable but is at least arguably constitutional." *Id.* at 1302-03 (quoting *Hamby*, 821 F.3d 1095). The same reasoning applies here. Even if officials were mistaken about the risk of transferring inmates out of CIM versus the risk of keeping them at

10

1   CIM, and even if their implementation of the transfer was imperfect or haphazard, the decision,

2   and its regrettable consequences, was at least arguably constitutional, in part because it was

3   directed and overseen by the federal Receiver.

4         In another analogous case, *Hines v. Youseff*, the Ninth Circuit found CDCR officials

5   qualifiedly immune because not "every reasonable official would [have understood] that exposing

6   inmates to a heightened risk of Valley Fever violated the Eighth Amendment." 914 F.3d 1218, at

7   1229-30 (9th Cir. 2019). This decision was based in large part on the fact that a "federal Receiver

8   appointed by the federal court to assure Eighth Amendment compliance actively managed the

9   state prison system's response to Valley Fever." *Id.* at 1231. And, because "the Receiver oversaw

10  prison medical care and protective measures regarding Valley Fever, state officials could have

11  reasonably believed that their actions were constitutional so long as they complied with the orders

12  from the Receiver and the *Plata* court." *Id.*

13        Like in *Hines*, the federal Receiver and the *Plata* court supervised CDCR's COVID-19

14  response. When the *Plata* court reviewed CDCR's response up through April 17, 2020, it found

15  the response did not violate the Eighth Amendment. *Plata*, 445 F. Supp. 3d at 562. The *Plata*

16  court expressed its intention to—and did—continually monitor CDCR's response to COVID-19,

17  convening weekly case management conferences during which the *Plata* plaintiffs reported on the

18  growing outbreak at CIM. *Id.* at 569; (RJN, Exhs. A-D). At the *Plata* plaintiffs' urging, and at the

19  direction of the federal Receiver, CDCR moved 122 medically vulnerable inmates from CIM to

20  San Quentin. (*See* Compl. ¶ 19; *see also* Compl. at 40, 44; RJN, Exhs. B at 9-10, C at 13-14, D at

21  10.) Just like in *Hines*, the decision to transfer those 122 medically high-risk inmates, based on

22  negative COVID-19 tests from prior weeks, was made under the supervision of the federal

23  Receiver. (*Id.*) Under these circumstances, one cannot say that every reasonable official would

24  have known that following this direction would violate the Eighth Amendment.

25        In hindsight, it is easy to judge the decision to transfer inmates from CIM to San Quentin as

26  unwise. But we will never know how many of those 122 inmates from CIM would have died had

27  they remained in place; nor can we know whether COVID would have nevertheless found its way

28  to San Quentin if the transfer had been aborted. And, at any rate, that is not the relevant legal

11

standard. The question is whether reasonable officials in Defendants' positions might have believed their conduct was constitutional. Because officials carried out the Receiver's directive to move these inmates, and because the Receiver's transfer protocols did not mandate how to test these inmates in advance of a transfer, reasonable officials could believe that the decision to transfer those inmates to San Quentin, relying on existing test results, was constitutional. (Compl. at 53, 60-61; Exh. H at 7-8.) Likewise, Defendants would have also believed that filling transport buses to 65% of their intended capacity was constitutional, in light of the urgency of removing these high-risk inmates from the CIM outbreak, especially given that CCHCS—run by a federally appointed Receiver—approved it. (*Id.*)

Finally, Mr. Thorpe cannot say that he had a clearly established right to particular inter-prison transfer and quarantine protocols. The general conclusion that an inmate has a clearly established right to be free from involuntary exposure to COVID-19 provides no "fair and clear" notice of what a reasonable official needed to do in *this* case, where medically vulnerable inmates housed in a congregate dorm facility stood in the path of rapidly spreading outbreak of the virus; where a federally appointed official identified these inmates for transfer to a COVID-free facility; and where unclear guidance from that official did not indicate when to test inmates in advance of a transfer, how many of them to move on a bus, or whether to place those inmates in protective quarantine at San Quentin upon their arrival there.

Out-of-circuit authority shows that heightened risk to COVID-19 in correctional settings is not inherently unconstitutional, even where agencies grappled with and failed to contain the virus. *See Swain v. Junior*, 961 F.3d 1276, 1283-84 (11th Cir. 2020) ("a resulting harm cannot establish a culpable state of mind," and the entirety of the facility's COVID-19 response was reasonable, despite response's failure to mitigate the spread of COVID-19); *Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) (Federal Bureau of Prisons' six-phase response to COVID-19 demonstrated officials responded reasonably, despite the fact that six people died).

And district courts have not reached a consensus about whether the failure to take certain countermeasures, similar to those identified in the Complaint, violate the Eighth Amendment. In *Kesling v. Tewalt*, 476 F. Supp. 3d 1077, 1087-88 (D. Idaho Aug. 4, 2020), the district court

12

1    dismissed a plaintiff's Eighth Amendment claim premised on the failure to issue masks to

2    correctional staff and failure to isolate inmates pending COVID-19 test results, and noted that "it

3    was unclear whether cloth masks would be particularly effective." It found the policy of returning

4    presumptively positive inmates to their cells reasonable under the Eighth Amendment because "it

5    would be impossible to isolate every inmate who would be potentially infected." *Id.* And, echoing

6    Plaintiff's allegations about transferring inmates without recent test results, the district court in

7    *Young v. Bonner*, No. 2:20-cv-02614-TLP, 2021 WL 4699089, at *1 (W.D. Tenn. Oct. 7, 2021),

8    found no Eighth Amendment violation where prison officials "placed inmates from another

9    facility into the pod without testing them" for COVID-19 in April 2020.

10          Other district courts have scrutinized more specific allegations about COVID-19

11   countermeasures and have come to similar conclusions. *Garcia v. Los Angeles County*, No. 2:20-

12   cv-08528-JVS-KES, 2021 WL 4497213, at *4-5 (C.D. Cal. July 7, 2021) (dismissing deliberate

13   indifference claims premised on "refusing to retest inmates who previously tested positive," not

14   providing adequate social distancing, and "not testing inmates coming into MCJ"); *Jones v. Lay*,

15   4:20-cv-1325-BRW-BD, 2021 WL 687342 (E.D. Ark. Jan, 25, 2021) ("reasonable correctional

16   officials would not have known that allowing [plaintiff] to remain in a barracks [with other

17   COVID-19 positive inmates] for six days after his negative test results was a violation of clearly

18   established law"); *Adam Lane ADC 155843 v. William Straughn, et al.*, No. 4:20-cv-01067-

19   BRW-JTK, 2021 WL 5240179, at *6 (E.D. Ark. Oct. 13, 2021) ("[A]t the time Plaintiff raised his

20   concerns, there was no clearly-established right as to prison ventilation and COVID-19

21   protocols."). That these district court opinions address allegations that arose in the early months

22   of the pandemic shows that what constitutes an Eighth Amendment violation is still in the process

23   of "becoming established." *Sorrels*, 290 F.3d at 971. These opinions reveal that Mr. Thorpe's

24   allegations do not show an "obvious" violation, and no existing precedent placed Defendants on

25   fair and clear notice in May 2020 that their conduct might violate the Constitution.

26          Because existing precedent did not recognize the unconstitutionality of this particular

27   conduct, the allegations fall "within the vast zone of conduct" that is regrettable, but arguably

28   constitutional. *Id.* at 1096. Even if more could have been done, the *Plata* Court noted in April

                                          13

1   2020 that "the Eighth Amendment does not afford litigants and courts an avenue for a *de novo*

2   review of the decisions of prison officials." *Plata v. Newsom*, 445 F. Supp. 3d at 569 (citing

3   *Money v. Pritzker*, 453 F. Supp. 3d 1103, 1132 (N.D. Ill. 2020)). The same must be said about

4   Mr. Thorpe's allegations. And while, in hindsight, additional or heightened measures could have

5   been taken, no robust consensus of authority would have put Defendants on notice that, in these

6   circumstances, where a burgeoning outbreak threatened the lives of 122 medically vulnerable

7   inmates, the failure to take heightened or additional measures before the prison transfer violated

8   the Eighth Amendment. Defendants are therefore entitled to qualified immunity.

9   **II.      DEFENDANTS ARE ALSO ENTITLED TO THE PUBLIC READINESS AND EMERGENCY**
    **        PREPAREDNESS (PREP) ACT'S BROAD IMMUNITY.**

10

11          The PREP Act also immunizes Defendants because they are "covered persons" and

12   Plaintiff's claim arises from their alleged administration of "covered countermeasures." *See* 42

13   U.S.C. § 247d-6d(a)(1) & (b); *Garcia v. Welltower OpCo Grp. LLC*, 522 F. Supp. 3d 734, 739

14   (C.D. Cal. 2021) ("the PREP Act provides sweeping immunity for certain claims against certain

15   individuals."). While no courts have yet applied the PREP Act to prisons, the HSS Secretary's

16   declaration immunizes governmental entities and employees who must make decisions about how

17   to use and administer countermeasures against COVID-19. And Plaintiff's allegations, if true,

18   implicate the PREP Act's immunity, because they show that Defendants are covered persons and,

19   but-for their alleged decisions about how to administer countermeasures at CIM and San Quentin,

20   Mr. Thorpe would not have contracted COVID-19. (*See* Compl. ¶¶ 7, 16-17, 21.)

21          "Covered countermeasures" include any drug, biological product, or device approved by

22   the Food and Drug Administration (FDA) and developed "to diagnose, mitigate, prevent, treat, or

23   cure a pandemic or epidemic" or used "to limit the harm such pandemic or epidemic might

24   otherwise cause." 42 U.S.C. § 247d-6d(i)(7); 85 Fed. Reg. 15202. The HSS General Counsel also

25   issued an advisory opinion, later incorporated into the Secretary's PREP Act declaration, which

26   explained that the definition of countermeasure includes respiratory devices and devices granted

27   Emergency Use Authorization by the FDA. *See Advisory Opinion on the PREP Act and March*

28   *10, 2020 Decl. Under the Act, as Modified on May 19, 2020*. And the FDA has identified items

14

like COVID-19 tests, ventilators, respirators, face shields, and decontamination devices as the types of medical devices granted Emergency Use Authorizations. Food & Drug Administration, *FDA Combating COVID-19 with Medical Devices*, https://www.fda.gov/media/136702/download (last accessed December 22, 2021). Here, Mr. Thorpe's claim is based upon when CDCR officials elected to conduct COVID-19 tests—a covered countermeasure—in relation to an inter-prison transfer. (*See* Compl. ¶¶ 14-17, 21, 34.)

Defendants are also covered persons under the Act. A "covered person" is a "program planner" of a covered countermeasure, or "an official, agent, or employee" of a program planner. 42 U.S.C. § 247d-6d(i)(2)(B). A "program planner," in turn, is a state or local government or their employee who supervised or administered a program concerning the administration, dispensing, provision, or use of a countermeasure, or who establishes requirements, provides policy guidance, or supplies technical advice or assistance, or provides a facility to administer or use countermeasures. *See* Advisory Opinion 20-04. Any individual or organization can potentially be a program planner and receive PREP Act coverage. *Id.* Defendants—two wardens and the former Secretary of CDCR—were allegedly "personally involved in ordering, approving, and/or acquiescing to the decisions relating to the CIM transfer," which included the decision to transfer inmates from CIM to San Quentin "without timely and adequate testing." (Compl. ¶¶ 8-10, 14.) If true, Mr. Thorpe's allegations establish that Defendants were "program planners," and thus covered persons.

Finally, Mr. Thorpe's alleged injury arose from Defendants' administration of covered countermeasures. The HSS Declaration defines "administration" to mean either 1) "physical provision of countermeasures," 2) "activities and decisions relating to public and private delivery, distribution, and dispensing of the countermeasures to recipients," or 3) "the management and operation of countermeasure programs or management and operation of locations for purpose of distributing and dispensing countermeasures." 85 Fed. Reg. 15200. This last aspect of the definition applies even to losses that do not relate directly to the countermeasure, "such as a slip-and-fall injury or a vehicle collision by a recipient receiving a countermeasure at a retail store

15

1   serving as an administration or dispensing location that alleges, for example, lax security or

2   chaotic crowd control." *Id.*

3       Immunity extends to "non-use" situations, including those where there is "prioritization or

4   purposeful allocation of a covered countermeasure, particularly if done in accordance with a

5   public health authority's directive." 85 Fed. Reg. 79197; *see also* Advisory Opinion 21-01

6   ("decision-making that leads to the non-use of covered countermeasures by certain individuals is

7   the grist of program planning, and is expressly covered by the PREP Act."). Thus, where program

8   planners engage in decision-making about how to use available countermeasures (as opposed to

9   simple nonfeasance or the failure to obtain countermeasures *in toto*), they are entitled to PREP

10  Act immunity even when they decide not to use a countermeasure. *Id.*; *see also Garcia*, 2021 WL

11  392581, at *8-9. Here, Mr. Thorpe's allegations about the CIM-to-San Quentin transfer implicate

12  the PREP Act's immunity. His claim is that he contracted COVID-19 because of *when* a group of

13  inmates was tested for COVID-19 relative to an inmate transfer. His claim is clearly one based in

14  an injury "caused by, arising out of, relating to, or resulting from" the administration of COVID

15  tests—a "covered countermeasure." It is therefore barred.

16      Even if Mr. Thorpe's claim were characterized as a "non-use" decisions—a complete

17  failure to test—it is barred. The transfer was a policy determination by CCHCS and CDCR

18  officials in response to an active outbreak at CIM. (Compl. ¶ 19; *see id.* at 40, 43-44; RJN Exh. C

19  at 10.) And Plaintiff alleges that Defendants made decisions to rely on old test results before the

20  transfer, and to test the CIM inmates after they arrived at San Quentin. (Compl. ¶¶ 16, 17, 21.)

21  Such a decision, to prioritize taking the inmates out of the dangerous environment of CIM first

22  and conducting tests later, is exactly the kind of non-use decision-making that is immunized by

23  the PREP Act and the Office of the General Counsel's January 8, 2021 guidance. *See* Advisory

24  Opinion 21-01.

25      Though these are novel circumstances, the PREP Act immunizes Defendants from

26  liability.[2] This action should be dismissed.

27      ───────────────

        [2] "[T]he sole exception to immunity from suit and liability of covered persons under the
28  PREP Act is an exclusive Federal cause of action against a covered person for death or serious

16

Defs.' Not. Mot. & Mot. Dismiss Compl. (3:21-cv-06960-WHO)

1

**CONCLUSION**

2        Defendants faced an evolving situation, rife with scientific uncertainty and a shifting factual

3   landscape. In the midst of a growing outbreak at CIM, they—with the direction and oversight of a

4   federally appointed Receiver—had to balance the risk of moving the medically high-risk inmates

5   out of CIM, possibly endangering the population at the receiving institution, against the risk of

6   leaving those inmates at CIM, where, as Mr. Thorpe acknowledge, six hundred inmates had been

7   infected and nine had died. Although in hindsight the decision to transfer the inmates when they

8   were transferred, and in the manner they were transferred, may have been unwise, it would not

9   have been clear to every reasonable official, in May 2020, that transferring medically-vulnerable

10  inmates from a prison with an exploding COVID-19 outbreak to a prison without any COVID-19

11  cases—at the direction and with the oversight of a federal Receiver—would violate the Eighth

12  Amendment. And the PREP Act provides yet another immunity from Mr. Thorpe's claim.

13        Because Defendants are immune under two different legal doctrines, and no amendment

14  could cure that defect, the Court should dismiss this action without leave to amend.

15

16  Dated: December 31, 2021                    Respectfully submitted,

17                                              ROB BONTA
                                                Attorney General of California
18                                              JEFFREY T. FISHER
                                                Supervising Deputy Attorney General
19

20

21                                              */s/ Cassandra J. Shryock*
                                                CASSANDRA J. SHRYOCK
22                                              Deputy Attorney General
                                                *Attorneys for Defendants*
23                                              *R. Diaz. R. Broomfield, and M. Houston*

24  SF2021304789
    43015275.docx
25

26

27  _____
    physical injury caused by willful misconduct." 85 Fed. Reg. 79198. If Mr. Thorpe's claims fall
28  under this exception, only the United States District Court for the District of Columbia has
    subject-matter jurisdiction to hear that claim. 42 U.S.C § 247d-6(e).

17

# CERTIFICATE OF SERVICE

Case Name:   *Reginald Thorpe v. Ralph Diaz, et al.*      Case No.   **3:21-cv-06960-WHO**

I hereby certify that on <u>December 31, 2021</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**

- **DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT with Exhibits A to I**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>December 31, 2021</u>, at San Francisco, California.

|  |  |
|---|---|
| B. Chung | */s/ B. Chung* |
| Declarant | Signature |

SF2021304789 /43023618.docx